# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

―――――――――――

Nº 09-CV-3578 (JFB)

―――――――――――

## ROBERT CLARK,

Petitioner,

VERSUS

## DEPUTY SUPT. CUNNINGHAM,

Respondent.

―――――――――――

**MEMORANDUM AND ORDER**
April 10, 2014

―――――――――――

JOSEPH F. BIANCO, District Judge:

Robert Clark ("petitioner" or "Clark") petitions this Court for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, challenging his conviction entered on August 20, 2002, in the Supreme Court of the State of New York, Suffolk County, for burglary in the second degree. Petitioner was sentenced to a term of imprisonment of twenty years to life. Petitioner challenges his conviction on seven grounds. Specifically, petitioner asserts that: (1) there was no probable cause for his arrest; (2) his written confession, which contained information obtained prior to the administration of *Miranda* warnings, should have been suppressed; (3) he was illegally searched and seized; (4) his Sixth Amendment right to counsel was violated; (5) he was denied the effective assistance of pre-trial and appellate counsel; (6) African Americans were systematically excluded from both the grand jury and petit juries; and (7) his sentence was illegal.

For the reasons set forth below, the Court denies the petition in its entirety. Specifically, the Court finds that petitioner's *Batson* claim is unexhausted and, therefore, procedurally barred from review. Moreover, the Court concludes that none of the claims are meritorious, and they provide no basis for habeas relief.

## I. BACKGROUND

### A. Factual Background

The Court has adduced the following facts from the instant petition and underlying record.

#### 1. Pre-Trial Hearing

Petitioner appeared with pre-trial counsel, Robert Macedonia, for a combined *Huntley* and *Mapp* pre-trial hearing on June 14, 2002 before Judge Michael Mullen of the Supreme Court, Suffolk County, State of New York. (Hr'g 4.)[1] Suffolk County Police

―――――――――――

[1] "Hr'g" refers to the pre-trial *Huntley* and *Mapp* Hearing held on June 14, 2002.

Department Detectives Nicholas Weisse and Jeffrey Mahon testified. (Hr'g 8-108.)

At approximately 4:00 p.m. on October 24, 2001, Detective Weisse reported to a Texaco gas station located about one-quarter mile from the scene of a burglary at 159 Harned Road in Commack, New York. (Hr'g 9-10.) Two uniformed police officers and petitioner, who was not handcuffed, were present when Detective Weisse arrived. (Hr'g 11-12.) Upon his arrival, Detective Weisse observed petitioner's ID card and seven or eight pawn tickets from pawn shops in both Suffolk County and the Bronx displayed on the hood of the police vehicle. (Hr'g 12.)

Officer William Popielaski told Detective Weisse "that he had been traveling southbound on Harned Road, and that he had observed a black male standing by the LILCO right-of-way where it meets Harned Road." (Hr'g 13.) Officer Popielaski then heard the report of the burglary at 159 Harned Road. (Hr'g 13.) As he continued driving back towards the man he observed, he realized that the man had been standing directly in front of the scene of the burglary when Officer Popielaski first saw him. (Hr'g 13-14.) While waiting for a marked sector car to arrive at the scene, Officer Popielaski saw the same male now running northbound on Harned Road. (Hr'g 14.) Officer Popielaski also told Officer Weisse that petitioner was on parole for burglary, and that a blue 1995 Ford Taurus may have been a part of the crime. (Hr'g 14.)

Detective Weisse remained at the Texaco with petitioner for twenty to thirty minutes, and then drove petitioner to a Shell gas station at the corner of Jericho Turnpike and Harned Road, where the Ford Taurus and a female were located. (Hr'g 15.) Petitioner went voluntarily. (Hr'g 15.) Detective Weisse testified that petitioner was not handcuffed, but was also not free to leave. (Hr'g 15.) Based on the information Detective Weisse received from Officer Popielaski, along with his own observations of the pawn tickets and his knowledge of Clark's parole status, Detective Weisse now considered petitioner a suspect in the burglary. (Hr'g 16.) Petitioner was not questioned during the drive. (Hr'g 18.)

When they arrived at the Shell, about one-half mile from the scene of the burglary, Danielle Alvarado was in the back seat of a police vehicle. (Hr'g 18.) The Ford Taurus was in the garage bay of the gas station. (Hr'g 19.) Five or six other police officers were at the Shell station as well. (Hr'g 19.) Initially, Alvarado was not handcuffed, but after she spoke with Detective Weisse, she and the petitioner were both handcuffed and arrested for burglary in the second degree (Hr'g 20-22). Petitioner became extremely agitated, screaming, "[W]hy are you arresting her?", and threatening to bite Detective Weisse. (Hr'g 22.) Petitioner was not read his *Miranda* rights at this point. (Hr'g 23-24.)

After the arrests, Detective Weisse drove back to the scene of the burglary, along with petitioner, to do a walk-through of the scene. (Hr'g 24.) Petitioner was not questioned during the drive, but when they arrived, he said, "[T]hat's the house." (Hr'g 25.)

According to Detective Weisse, upon returning to the Fourth Precinct, petitioner was handcuffed to a desk inside an interview room. (Hr'g 26-27.) He was advised of his constitutional rights using a "rights statement." (Hr'g 28.) Petitioner was instructed to initial next to each right after Detective Weisse read it off the rights statement. (Hr'g 31-33.) Petitioner said he understood his rights. (Hr'g 33.) Detective Weisse then took a written statement from petitioner about the burglary. (Hr'g 29.)

Additionally, Detective Weisse ascertained that petitioner could read and understand English, by having him read the first line of his written statement out loud. (Hr'g 35.) Once the statement was completed, petitioner read and signed it. (Hr'g 39.) Petitioner also signed consent forms for searches of the Ford Taurus (Hr'g 41), and his motel room at the Townhouse Motor Inn in Smithtown (Hr'g 44). Petitioner never requested an attorney or expressed a desire to stop talking to Detective Weisse. (Hr'g 45.) Petitioner never indicated that he did not understand what was happening, nor was he threatened or coerced. (Hr'g 45.)

The Ford Taurus was brought back to the Fourth Precinct and searched by Detective Weisse, who found three cameras inside. (Hr'g 47-48.)

Detective Jeffrey Mahon testified that, on October 12, 2001, he investigated a burglary at 16 Ledgewood Avenue in Smithtown, New York. (Hr'g 86.) Three cameras, assorted jewelry, and some cash were stolen. (Hr'g 86.) On October 24, 2001, Detective Mahon learned that three cameras were recovered from the vehicle involved in the Harned Road burglary. (Hr'g 87.) Upon investigation, Detective Mahon discovered that the serial numbers on the recovered cameras matched the serial numbers of the cameras stolen in the October 2001 burglary. (Hr'g 87-88.) Additionally, the homeowner from the Smithtown burglary, Mr. Hillebrand, physically identified the cameras and made an identification statement to the police. (Hr'g 88.)

After Mr. Hillebrand identified the cameras, Detective Mahon proceeded to read petitioner his *Miranda* rights, prepare a rights statement, and interview him. (Hr'g 88-89.) Petitioner initialed and dated the rights statement, indicating that he was waiving his rights. (Hr'g 91.) Detective Mahon then took a statement from petitioner, which the detective reduced to writing. (Hr'g 94.) Petitioner never asked for an attorney, never indicated that he had changed his mind about cooperating, and was never threatened or made any promises regarding Alvarado. (Hr'g 98.)

## 2. Trial

At trial, Detectives Weisse and Mahon provided the testimony already described from the pre-trial hearing. Additionally, they testified to the following.

When Detective Weisse responded to the Texaco gas station on October 24, 2001, Police Officers Popielaski and Massaro were there. (Tr. 569.)[2] Petitioner was in the back of Officer Popielaski's car. (Tr. 572.) Officer Popielaski showed Detective Weisse property he had taken from petitioner, including petitioner's New York ID card and pawn tickets. (Tr. 573.) Sometime between 3:30 p.m. and 4:30 p.m. (*see* Tr. 652, 577), Detective Weisse spoke with Clark about the Ford Taurus and his girlfriend, who had argued with Clark and driven off without him (Tr. 664). When Detective Weisse learned that the Taurus had been discovered at a Shell station, he informed petitioner that they had located "his girlfriend and his vehicle," and he drove with a Detective Stewart and petitioner to the Shell station. (Tr. 574-75). Detective Weisse testified that when he and Detective Stewart arrived with the petitioner at the Shell station, Alvarado was not handcuffed, but she was also not free to leave. (Tr. 685.)

Once Detective Weisse had returned to the scene of the burglary at 159 Harned Road, he learned that a microwave oven and a pillowcase filled with other personal items

[2] "Tr." Refers to the transcript from the trial held from August 12, 2002 to August 20, 2002.

that had been stolen were found in some bushes near the residence. (Tr. 579-80.) No additional property was found in petitioner's motel room. (Tr. 625.) In addition to the three cameras found in the Ford Taurus (Tr. 617-18), a black plastic case and a watch were also found (Tr. 620). After returning to the Fourth Precinct, Detective Weiss removed the remaining items from petitioner's wallet and discovered ten pawn slips and three pawn identification cards. (Tr. 626.) Detective Gottlieb recovered jewelry from one of the pawn shops using these pawn slips (Tr. 636), and Detective Weisse showed the jewelry to the Hillebrands (Tr. 640). The jewelry was pawned on October 22, 2001 and included one eighteen carat chain, one bracelet, and three pairs of earrings. (Tr. 635.) Mrs. Hillebrand identified the jewelry as the jewelry that was stolen from her residence in Smithtown on October 12. (Tr. 641).

At the Fourth Precinct, at approximately 7:45 p.m., petitioner was informed of his *Miranda* rights and was interviewed. (Tr. 584, 599-600.) At about 8:30 p.m. (Tr. 611), Detective Weisse produced a written statement (Tr. 600):

> I, Robert Clark, being duly sworn, deposes and says: I am thirty two years of age, having been born on May 25th, 1969 at Amityville, New York. I have been staying at the Town House Motor Inn, Jericho Turnpike, Smithtown, with my girlfriend, Crystal Behling. I also sometimes stay with another friend, Danielle Alvarado, who lives in Wyandanch.
>
> Today, October 24th, 2001, at about 9:30 a.m., I was driving my girlfriend, Crystal's 1995 coupe Ford Taurus, New York Reg AEX-4715, and I went and picked up Danielle at

her house. We both went to the Bronx.

> At about 1:30 p.m., we left the Bronx and we were coming back to Long Island. I got off the Sagtikos Parkway at the Harned Road Exit. Me and Danielle were fighting about money because she needed money for our baby and I didn't have any to give her. I got out of the car that was stopped at a traffic light and Danielle drove away. I was walking around, and a little while later, Danielle came back in a different car with a stranger.
>
> Danielle got out of the car. She told me that my car broke down and it was at the gas station and that she left the keys with the attendant. So we started arguing again because she left the keys with the guy at the gas station. Danielle tells me she's going to tell Crystal about our baby. I am mad that my car is broken down. Danielle tells me that my baby is more important than that f****ng car. I'm trying to calm her down, telling her, 'I don't got no money. What do you want me to do?' Danielle tells me that I got to do something. I say to Danielle, 'There's nobody in this house here,' which was on Harned Road.
>
> We both go to a basement window on the right side of the house. I kicked out the window and Danielle went in. After a couple of minutes, she tripped the alarm in the house. I was standing in the back of the house, waiting for her. After the alarm tripped, Danielle came to the back door and asked me what I wanted her to do. I told her to hurry up. She went upstairs and came

down with a pillowcase filled with stuff she had stolen and she, then, handed it to me.

I took the pillowcase with the stolen stuff and stashed it in the bushes. I went back to the rear door and Danielle had a microwave. I took that from her and I put it next to the pillowcase in the bush.

We were walking to see about my car. I then, saw a squad car pull up to the house we had just broken into. I then jogged to the Getty gas station on Vets Highway, but it was the wrong one. I then went to a Texaco gas station. On the way to the gas station, I talked to a police officer in an unmarked car. I asked him if he could take me to a Getty gas station. I told him I had an argument with my girlfriend and my car broke down. He asked me why I was breathing so hard, and I told him it was because I had just run from the Getty Gas Station, but I really had been running from the first time I saw the police car.

I have read the above three-page statement that Detective Weisse has written for me and I swear it is all true.

(Tr. 601-606.)

Petitioner's written statement included information that he had told the detective at the Texaco station, before he had been read his rights. (Tr. 666.) Detective Weisse testified that petitioner never asked for the consent forms for the Ford Taurus and motel room to be explained further, and that there was no indication that he did not understand them. (Tr. 616, 625.) While in the interview room, petitioner was given a cigarette that was later collected by a police officer and sent to a crime lab. (Tr. 699-700.)

Detective Mahon testified that he investigated the October 12, 2001 burglary at 16 Ledgewood Drive (Tr. 709), and that he came to learn about the three cameras discovered on October 24, 2001 (Tr. 734). One of the cameras was a digital and had a picture of a young Black male standing in front of an older Black male who was lying on a couch. (Tr. 747.) A photo developed from another camera revealed a TV set and was likely taken in a motel room. (Tr. 750, 752.) The film from the third camera had been removed. (Tr. 750.)

Detective Mahon read petitioner his *Miranda* rights and interviewed him. (Hr'g 88-89.) Detective Mahon then took a written statement from petitioner:

I, Robert Clark, being duly sworn, deposes and says: I am thirty two years old, born on 5-25-69 and I am living at the Town House Motel in Smithtown. I'm at the Fourth Precinct talking to and giving this statement to Detectives Mahon, Cicci and Weisse.

About two weeks ago I was with Danielle Alvarado who met me at the Town House Motor Inn. We walked up to the pizza place. I had no money. I got high with a couple of white kids in a car. Danielle was watching my stuff at the bus stop. I went over to her. I was coming down and wanted to get high again. I called Crystal but she wasn't coming until 12:30. I knew I could rob a house and get back before then.

I told Danielle I was going to take a walk. She said she'd go with me. I walked up a hill. She asked where I was going. I said 'to find some money or something.' I was craving

5

for more drugs by now feelings for crack.

We came to a house up on a hill, rang the doorbell, banged on the door, no cars were there and no one was home. We went around the back. There was a shovel on the ground. The pool up on the hill. Tried to pry open the sliding door. It didn't go. I kicked      in a basement window, it went in, the screen, no glass broke. Danielle went in the window. I couldn't because I'm too big. She went up and opened the side door next to the garage for me. I went in.

We were in the house maybe fifteen, twenty minutes, got some jewelry, nothing good,      cash, a lot of change in jars, and a fifty-dollar bill. Costume jewelry, three cameras. (I took pictures with the camera with the T.V. on the back later, Danielle in the hotel, my niece and nephew, Crystal my girlfriend.)

We put all the stuff in a backpack from the house. We had checked all the rooms, then left out the side door. We went back to the bus stop. This was between 10:00 and 12:30 in the morning. We threw out the jewelry, spent the cash and kept the cameras.

Danielle told me the basement window went into an old bathroom. There was a big chain saw in the kitchen, too big to carry. It was a bad decision for both of us to do this. We realized it later.

I've read this three-page statement and it is all true.

(Tr. 768-771.)

Detective Theodore Cicci testified that

on October 24, 2001, he assisted Detective Mahon with Clark and Alvarado. (Tr. 789.) Detective Cicci photographed Clark's and Alvarado's shoes to compare them with footwear impressions found at the scene of the burglary at 159 Harned Road in Commack. (Tr. 789.)

Police Officer Christopher McDonald was assigned to the Suffolk County Crime Scene Section on October 24, 2001, and investigated the burglary at Harned Road. (Tr. 805-06). He testified that the point of entry was a basement window and the point of exit was a sliding glass door on the east side of the house. (Tr. 809.) However, he was only able to theorize about how an individual would have gotten themselves through that window. (Tr. 857-859.) Officer McDonald photographed the crime scene. (Tr. 810.) He also dusted the items found outside by the street (Tr. 819), and found latent fingerprints on a Stern's paper box top. (Tr. 820-22.) A magnifying glass found inside the home also revealed a latent fingerprint. (Tr. 824.) He also discovered a fingerprint on the banister in the basement (Tr. 827), and a footwear impression on a glass table (Tr. 832). He had not been told that petitioner had been brought to the crime scene that day. (Tr. 863.) Officer McDonald testified that fingerprints are very fragile evidence and easily damaged, which affects their reliability. (Tr. 871.)

Officer Popielaski testified that, on October 24, 2001, he was driving an unmarked Chevrolet Camaro (Tr. 879), and wearing a windbreaker to disguise his uniform (Tr. 911-912). At about 3:00 p.m., he drove past a right-of-way on Harned Road, and saw a Black male standing on the curb between a residence and the right-of-way. (Tr. 883.) Officer Popielaski continued driving to a firehouse substation, where he encountered Officer Kramer. (Tr. 884-85.) He then heard a radio call dispatched for a

house alarm at 159 Harned Road (Tr. 885), and both officers responded to the residence (Tr. 886). Officer Popielaski testified that he knew this address was "right around" where the right-of-way was. (Tr. 886). En route to the residence, he saw the same individual from earlier, now about 300 feet from where he had originally been, running northbound. (Tr. 887.) Officer Popielaski continued toward the residence to confirm that there had been a burglary. (Tr. 888.) He stayed inside the residence for thirty seconds, and then immediately traveled northbound in his vehicle to look for the running individual. (Tr. 888.) Officer Popielaski eventually found the individual, still running, and pulled his vehicle over about fifty feet in front of the individual. (Tr. 892.) The individual he encountered was petitioner. (Tr. 893.)

Petitioner approached Officer Popielaski's car, and they had a short conversation. (Tr. 894.) Officer Popielaski then followed petitioner, who was on foot, to a Texaco gas station at the corner of Veterans Highway and Harned Road. (Tr. 894.) No words were exchanged between Officer Popielaski and petitioner en route to the Texaco station. (Tr. 922.) Petitioner never attempted to run. (Tr. 923.)

Once at the Texaco, Officer Popielaski used a pay phone to request for additional police units to respond to the gas station. (Tr. 896.) While waiting for assistance, Officer Popielaski asked petitioner for identification. (Tr. 897.) While petitioner was taking identification out of his wallet, Officer Popielaski noticed pieces of paper appearing to be pawn receipts, sticking out of the wallet. (Tr. 897-898.) Officer Popielaski asked him what these items were, and petitioner responded "receipts." (Tr. 930.) Petitioner took them out of his wallet, and Officer Popielaski took them from petitioner to observe them. (Tr. 930.) Officer

Popielaski testified that petitioner was not free to leave at this point. (Tr. 931.) When petitioner became "fidgety," Officer Popielaski handcuffed him so petitioner would not try to run. (Tr. 899.) Officer Popielaski testified that, although petitioner was under suspicion for the burglary, there was not yet probable cause to make an arrest. (Tr. 933-34.) While petitioner was handcuffed, Officer Popielaski had a conversation with him about what he had been doing prior to seeing Officer Popielaski. (Tr. 935.) Petitioner was never read his *Miranda* rights while at the Texaco station. (Tr. 958-59.)

After being at the Texaco for about ten to fifteen minutes, Sergeant Massaro arrived (Tr. 899), and instructed Officer Popielaski to remove the handcuffs from petitioner (Tr. 900). Petitioner had been handcuffed for approximately five minutes. (Tr. 965.) Officer Popielaski informed Sergeant Massaro about the situation, and Sergeant Massaro left the Texaco to look for petitioner's girlfriend and vehicle at other gas stations. (Tr. 902.) Detectives Weisse and Stewart arrived at the Texaco (Tr. 902), and conversed with petitioner for five to ten minutes (Tr. 959). Weisse and Stewart then left the Texaco station with petitioner. (Tr. 902.) Officer Popielaski returned to the scene of the burglary at 159 Harned Road to assist with paperwork. (Tr. 903.)

Michael Hillebrand testified that he lives at 16 Ledgewood Drive in Smithtown. (Tr. 972.) When he returned home on October 12, 2001, he found his side door to the garage open, everything in his home thrown around, and items missing from inside his home. (Tr. 973.) The missing items included constitutional issue to a claim against a term rm of a sentencr. Hillebrand filled out an inventory of missing items. (Tr. 974-75.) On October 24, 2001, Detective Mahon called Mr. Hillebrand down to the Fourth Precinct

to identify cameras that had been discovered. (Tr. 975-76.) Mr. Hillebrand compared the serial numbers of the cameras stolen from him to the cameras in the precinct, and made a positive identification. (Tr. 976.) Mr. Hillebrand testified that one of the pictures on the digital camera and one of the pictures developed off the film camera had not been taken by him. (Tr. 985-86.) He did not know the people or the locations depicted in the pictures. (Tr. 986.) Mr. Hillebrand and his wife also positively identified the jewelry in the precinct as the jewelry that had been taken from their home. (Tr. 987.) Mr. Hillebrand testified that he never gave petitioner or Alvarado permission to come into his home or to take his property. (Tr. 987.)

Detective Michael Mongan testified that he was working on October 24, 2001, and became involved in the burglary at Harned Road. (Tr. 991-92.) When Mongan arrived at the residence, the homeowner showed him inside and pointed out what had been disturbed. (Tr. 1012.) Detective Mongan testified that he believed someone slipped in through a forced-open window. (Tr. 1027.) After returning to the precinct, Detective Mongan took down petitioner's pedigree information, including his description, height, weight, etc. (Tr. 1010.)

Detective Ronald Gottlieb is part of the Property Recovery Unit. (Tr. 1040-41.) After speaking with Detective Weisse, Detective Gottlieb travelled to Good Fortune Pawn Brokers in the Bronx to recover proceeds. (Tr. 1041-42.) At the pawn shop, he examined the shop's records of transactions (Tr. 1042), searching for the names Robert Clark, Crystal Behling, and Danielle Alvarado (Tr. 1043). Detective Gottlieb discovered a sale made by Clark on October 22, 2001, and recovered the merchandise from that sale. (Tr. 1044.) The merchandise included three pairs of earrings,

a yellow metal bracelet, and a yellow metal necklace. (Tr. 1045.)

Detective Diane Hopkins worked in the Identification Section of the Suffolk County Police Department. (Tr. 1062.) Detective Hopkins testified as an expert (Tr. 1065-66), explaining that her main duty is to conduct fingerprint comparisons and process items of evidence she receives from Suffolk County precincts, as well as process crime scenes to try to develop latent fingerprints (Tr. 1063). On July 31, 2002, Detective Hopkins compared the photograph of a fingerprint found on the Stern's paper box outside the Harned Road residence to Robert Clark's exemplar fingerprint, which was a match. (Tr. 1071, 1078.) This finding was verified by another examiner in her office. (Tr. 1079.)

At the beginning of trial on August 19, 2002, defense counsel orally moved to suppress the written statement collected by Detective Weisse, because it contained information obtained by Weisse before petitioner had been Mirandized, violating his Fifth and Sixth Amendment rights. (Tr. 1116-17.) The defense also moved to suppress the pawn slips obtained by Officer Popielaski, contending that they were obtained by an unlawful search and seizure. (Tr. 1117-19.) In ruling on the existence of probable cause for the seizure of the pawn tickets, the court held that "the defen[se] had made no sworn allegations of fact in support of an application for a *Dunaway* Hearing." (Tr. 1156.) In ruling on the statement made to Detective Weisse, the court held that "we have the law of the case" and it was up to the jury to determine if it was voluntarily given. (Tr. 1159.)

Carol McGahan resides at 159 Harned Road in Commack with her husband. (Tr. 1130.) On October 24, 2001, she received a phone call from her alarm company, and she

returned home within five minutes. (Tr. 1131-32.) Once there, she heard the alarm sounding, saw the basement door ajar and broken, and the staircase down. (Tr. 1132.) She testified that jewelry boxes, jewelry, and a microwave were all missing. (Tr. 1133.) The property found in the LILCO right-of-way was her property. (Tr. 1137-38.) She does not know Clark or Alvarado, and did not give them permission or consent to enter her home or take her property. (Tr. 1141.)

Margaret Melden-Sharpe testified that she is employed at the Suffolk County Crime Laboratory in the Trace Evidence Section (Tr. 1164), which includes footwear impressions (Tr. 1166). On November 9, 2001, she examined materials related to this case. (Tr. 1180.) She compared known footwear (Timberland boots and Marc Ecko shoes whose owners are known) (Tr. 1180-81), to the partial footwear impression recovered onto a hinge lift for this case (Tr. 1184). The partial footwear impression was consistent with the tread pattern, size and wear characteristics of the Marc Ecko shoes that had been submitted for comparison. (Tr. 1195, 1206.) A positive identification (meaning that shoe and only that shoe could have made the impression) was not made, but the consistencies indicated that the Marc Ecko shoe could have made the impression. (Tr. 1205-06.)

At the conclusion of Ms. Sharpe's testimony, the People rested, (Tr. 1221), and the defense did not call any witnesses, (Tr. 1229). The defense moved for a trial order of dismissal. (Tr. 1222-24.) The motion was denied. (Tr. 1226.) Defense also moved for a mistrial due to unconstitutional and unlawful obtaining of evidence that was submitted to the jury, which was also denied. (Tr. 1226.) The jury found Clark guilty on both counts of burglary. (Tr. 1340-41.)

### 3.      Sentencing

Clark was sentenced to two concurrent terms of twenty years to life as a persistent violent felony offender on September 20, 2002. (Sentencing, Supreme Ct. Suffolk County, 27, "Sentencing".)

### 4.      *De Novo* Suppression Hearing

By order of the Appellate Division, Second Judicial Department, a *de novo* suppression hearing was held on November 29, 2006. (*See* Op. of N.Y. App. Div.: Second Judicial Department, dated May 23, 2006, "Op. 5/23/06".) The hearing addressed the "application made during trial to suppress the pawn tickets and fruits thereof," and to decide whether or not Clark's oral and written statements should have been suppressed. (Op. 5/23/06.) Officer Popielaski testified. (Suppression Hr'g 8-105.) In particular, he testified that when petitioner produced a non-driver's identification (Suppression Hr'g 35), Officer Popielaski asked petitioner if he had anything else with his name on it (Suppression Hr'g 36). As Mr. Clark was rummaging through his wallet, Officer Popielaski saw papers sticking out and asked what they were. (Suppression Hr'g 36.) Petitioner responded, "[r]eceipts from my property." (Suppression Hr'g 36.) Officer Popielaski took them out of petitioner's hand. (Suppression Hr'g 37.) Officer Popielaski also testified that, after he had taken the pawn tickets and handcuffed petitioner, he used a mobile data system to confirm that this man was Robert Clark, and that he was on parole. (Suppression Hr'g 37-41.) Officer Popielaski also testified that he was not concerned that petitioner was armed, and that petitioner did not pose any physical threat or try to resist at all. (Suppression Hr'g 77.) Additionally, Popielaski testified that the pawn slips did not contribute to his decision to handcuff

petitioner. (Suppression Hr'g 85-86.)

On December 14, 2006, Judge Mullen issued a written decision and order holding that that Officer Popielaski's conduct was proper, and that no evidence indicated that Clark refused to turn over the pawn tickets, or that they were taken against his will. (Op. of Supreme Ct. Suffolk County, dated December 14, 2006, "Op. 12/14/06".) The court found probable cause for Clark's arrest, and reasoned that the pawn tickets did no more than confirm that the person Officer Popielaski had seen running from the scene of the burglary was named Robert Clark. (Op. 12/14/06.)

B. Procedural History

In or around November 2001, a grand jury indicted Robert Clark and Danielle Alvarado on two counts each of burglary in the second degree. (Indictment 1-2.) On November 26, 2001, the trial court reviewed the transcript of the grand jury proceedings and determined "that the evidence presented to the Grand Jury was 'legally sufficient' to sustain each count of the indictment as to the criminal liability of the defendant." (Op. of County Ct., dated November 26, 2001, "Op. 11/26/01".) A combined *Huntley* and *Mapp* hearing was held on June 14, 2002. (Hr'g 1-120.) On June 24, 2002, the court ruled that the two written statements given by petitioner to Detective Weisse and Detective Mahon, respectively, were admissible because petitioner had been "advised of his rights and knowingly, voluntarily, and intelligently waived them." (Hr'g Mem., Supreme Ct. Suffolk County, dated June 24, 2002, "Hr'g Mem.".) The court also held that a warrantless search of the 1995 Ford Taurus, which led to the discovery of stolen cameras, was consented to and valid. (Hr'g Mem.)

From August 12 to August 20, 2002, a trial by jury took place on the charges, and petitioner was convicted of both counts of burglary in the second degree. (Tr. 1340-41.) On September 20, 2002, petitioner was sentenced as a persistent violent felony offender to two concurrent terms of a twenty years to life in prison. (Sentencing 27.)

On September 25, 2002, petitioner filed a notice of appeal from every part of the judgment, conviction and sentence. (Notice of Appeal, County Court, Suffolk County, dated September 25, 2002.) Petitioner's appellate counsel made three arguments on appeal: (1) the lower court erred in denying petitioner's motion during trial to suppress physical evidence that was illegally obtained; (2) the lower court erred in denying his motion to suppress written statements; and (3) petitioner received ineffective assistance of counsel prior to trial. (Appellant's Br., N.Y. App. Div.: Second Judicial Department, 1-31, "App. Br.") On May 23, 2006, the Appellate Division remitted the case to the Supreme Court, Suffolk County to address the suppression motion. (Op. 5/23/06.) The Appellate Division also held that petitioner did not move for a *Dunaway* hearing, but did move to suppress physical evidence and written statements. (Op. 5/23/06.)

The suppression hearing was held on November 29, 2006, and petitioner was represented by his trial attorney, Mr. Del Col. (*See* Suppression Hr'g, 1-140.) On December 14, 2006, the Supreme Court concluded that there was no evidence that petitioner had refused to turn over the pawn tickets or that they were taken against his will; the petitioner's "proximity to the location of a confirmed burglary, subsequent flight and unlikely explanation for running down a highway gave reasonable suspicion that [petitioner] was involved in the crime"; and probable cause existed for petitioner's arrest. (Op. 12/14/06.)

After the hearing, counsel filed a brief and made two arguments: (1) "the amplified record confirms that the forcible stop and search of [petitioner] were illegal"; and (2) "the amplified record confirms that the written statement should be suppressed on *Dunaway* grounds." (Pet'r Br. Following Hr'g, N.Y. App. Div.: Second Judicial Department, 1-16, "Pet'r Br. Following Hr'g.") On December 4, 2007, the Appellate Division issued a decision modifying the judgment of the lower court. (Op. of N.Y. App. Div.: Second Judicial Department, dated December 4, 2007, "Op. 12/4/07".) The court vacated the conviction and sentence that was imposed for the Smithtown burglary. (Op. 12/4/07.) The court granted petitioner's application made during trial to "suppress certain pawn tickets and the fruits thereof," and ordered a new trial for the Smithtown burglary charge. (Op. 12/4/07.) The court affirmed the judgment on count one of the burglary charge, and ruled that petitioner's claim to suppress his written statements was without merit. (Op. 12/4/07.) On January 7, 2008, counsel moved for leave to appeal to the New York State Court of Appeals. (Appl. For Leave, N.Y., dated January 7, 2008.)

On June 30, 2008, the County Court for Suffolk County ("County Court") granted the government's motion to dismiss the burglary charge that had been remanded for a new trial, because the Appellate Division left petitioner's sentence of twenty years to life "undisturbed." (*See* Resp't Br., County Court, Suffolk County, dated December 4, 2008.) On October 28, 2008, petitioner submitted a N.Y. C.P.L. § 440.10 motion and brief to vacate his conviction due to ineffective assistance of pre-trial counsel. (Pet'r Br., County Ct. Suffolk County, dated October 28, 2008, "Pet'r Br. 10/28/08".) Petitioner contended that his pre-trial counsel failed to provide him with professional advice about the prosecution's

twelve-year plea offer. (Pet'r Br. 10/28/08.) On January 9, 2009, petitioner's motion was denied without a hearing by Judge James Hudson in County Court. (Op. of County Ct. Suffolk County, dated January 9, 2009.) On July 24, 2009, the Appellate Division denied petitioner leave to appeal the denial. (Op. of N.Y. App. Div.: Second Judicial Department, dated July 24, 2009.)

On December 2, 2009, petitioner moved before the Supreme Court of Suffolk County to set aside the sentence imposed on him on January 25, 1995, or in the alternative, for a hearing to determine if the sentence was illegally imposed. (Pet'r Br., Supreme Ct. Suffolk County, dated December 2, 2009, "Pet'r Br. 12/2/09".) Petitioner argued that he should have been sentenced as a second violent felony offender in 1995, as opposed to a second felony offender. (Pet'r Br. 12/2/09.) On March 2, 2010 Judge Stephen Braslow denied petitioner's motion in its entirety, holding that the sentence from 1995 "has long since expired" and "no tangible relief" was possible. (Op. of County Court, Suffolk County, dated March 2, 2010.)

On May 25, 2010, petitioner made a N.Y. C.P.L § 440.20 motion to set aside his 2002 sentence. (Pet'r Br., Supreme Ct. Suffolk County, dated May 25, 2010 "Pet'r Br. 5/25/10".) Petitioner made two arguments. First, he argued that his 1995 plea agreement and sentence was illegal and unconstitutional, so it could not be used as a predicate to his 2002 sentence. (Pet'r Br. 5/25/10.) Second, he argued that he received ineffective assistance of pre-trial and trial counsel for "failure to recognize the defect regarding [petitioner's] 1995 sentence." (Pet'r Br. 5/25/10.) On September 7, 2010, Judge James Hudson of the County Court denied petitioner's motion in its entirety. (Op. of County Court, Suffolk County, dated September 7, 2010, "Op. 9/7/10".) The court ruled that petitioner had already made the

same motion, which was denied by Judge Braslow on March 2, 2010, and thus, his application was denied pursuant to. § 440.10(3)[b] and [c]. (Op. 9/7/10.) The court also ruled that petitioner received effective assistance of counsel and was not denied due process of law. (Op. 9/7/10.)

On August 25, 2010, petitioner filed a motion for writ of error *coram nobis* to the Appellate Division. (Pet'r Br., N.Y. App. Div.: Second Judicial Department, dated August 25, 2010, "Pet'r. Br. 8/25/10".) Petitioner argued that he was deprived of his Sixth and Fourteenth Amendment rights to effective assistance of appellate counsel in several respects. First, he claimed that his appellate attorney was ineffective for not raising a "dead bang" winning issue (that petitioner did not have an attorney assigned to him during arraignment). Second, he argued that his appellate attorney was ineffective for not arguing the spillover effect on the remaining count of the indictment. Third, he argued that he was constructively denied assistance of counsel.

On September 28, 2010, petitioner requested permission for leave to appeal to the Appellate Division. (Pet'r Br., N.Y. App. Div.: Second Judicial Department, dated September 28, 2010, "Pet'r Br. 9/28/10".) Petitioner argued that his illegal sentence should have been vacated and that in a previous ruling Judge Hudson had misunderstood petitioner's prior criminal history. (Pet'r Br. 9/28/10.)

Petitioner's *coram nobis* motion was denied on January 18, 2011. (Op. of N.Y. App. Div.: Second Judicial Department, dated January 18, 2011, "Op. 1/18/11".) The court ruled that petitioner "failed to establish that he was denied the effective assistance of appellate counsel." (Op. 1/18/11.)

On February 24, 2011, petitioner filed a request for leave to appeal the denial to the Court of Appeals. (Pet'r Br., N.Y., dated February 24, 2011, "Pet'r Br. 2/24/11".) He argued that there were five unsettled questions of law: (1) whether or not he "was denied the right to counsel at arraignment, preliminary hearing [*sic*]"; (2) whether he was "constructively denied the right to assistance of counsel at arraignment and during the four days preceding the filing of the indictment"; (3) whether "assessing prejudicial spillover of evidence from the dismissed count affected the whole trial" requiring the remaining count to be dismissed; (4) whether "the law required dismissal of the indictment in its entirety" after an Appellate Division ruling that there was not probable cause for the arrest; and (5) "whether all evidence flowing from an illegal arrest is fruit of the poisonous tree or becomes fruit of the poisonous tree" after the Appellate Division determined there was not probable cause for the arrest. On May 9, 2011, the Court of Appeals denied the application, ruling that there was no question of law presented that "ought to be reviewed by the Court of Appeals." (Op. of N.Y., dated May 9, 2011.)

## C. The Instant Petition

Petitioner filed this instant petition for a writ of habeas corpus on August 13, 2009. Petitioner later filed an amended petition on July 21, 2011. Respondent filed its memorandum of law in opposition to the petition for writ of habeas corpus on November 14, 2011. (Resp't Br., E.D.N.Y., dated November 14, 2011.) The Court has fully considered the arguments and submissions of the parties.

## II. STANDARD OF REVIEW

To determine whether a petitioner is entitled to a writ of habeas corpus, a federal court must apply the standard of review set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death

Penalty Act ("AEDPA"), which provides, in relevant part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). "'Clearly established Federal law'" is comprised of "'the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'" *Green v. Travis*, 414 F.3d 288, 296 (2d Cir. 2005) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).

A decision is "contrary to" clearly established federal law, as determined by the Supreme Court, "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law" or "if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13. A decision is an "unreasonable application" of clearly established federal law if a state court "identifies the correct governing legal principle from [the Supreme Court's]

decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id.* at 413.

AEDPA establishes a deferential standard of review: "'a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.'" *Gilchrist v. O'Keefe*, 260 F.3d 87, 93 (2d Cir. 2001) (quoting *Williams*, 529 U.S. at 411). Additionally, while "'[s]ome increment of incorrectness beyond error is required . . . the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence.'" *Id.* (quoting *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000)). Finally, "if the federal claim was not adjudicated on the merits, 'AEDPA deference is not required, and conclusions of law and mixed findings of fact . . . are reviewed *de novo*.'" *Dolphy v. Mantello*, 552 F.3d 236, 238 (2d Cir. 2009) (quoting *Spears v. Greiner*, 459 F.3d 200, 203 (2d Cir. 2006)).

### III. DISCUSSION

Petitioner argues he is entitled to habeas relief on seven grounds: (1) there was no probable cause for his arrest; (2) his written confession, which contained information obtained prior to the administration of *Miranda* warnings, should have been suppressed; (3) he was illegally searched and seized; (4) his Sixth Amendment right to counsel was violated; (5) he was denied effective assistance of counsel; (6) African Americans were systematically excluded from both the grand jury and petit jury; and (7) his sentence was illegal.

## A. *Batson* Claim

Respondent argues that petitioner's claim of systematic exclusion of African Americans from the grand and petit juries is procedurally barred from review. The Court agrees.

### 1. Failure to Exhaust

A district court shall not review a habeas petition unless "the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). Although a state prisoner need not petition for certiorari to the United States Supreme Court to exhaust his claims, *see Lawrence v. Florida*, 549 U.S. 327, 333 (2007), the petitioner must fairly present his or her federal constitutional claims to the highest state court having jurisdiction over them, *see Daye v. Att'y Gen. of N.Y.*, 696 F.2d 186, 191 (2d Cir. 1982) (en banc). Exhaustion of state remedies requires that a petitioner "fairly presen[t] federal claims to the state courts in order to give the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971)) (alteration in original) (internal quotation marks omitted).

Generally, to establish exhaustion, passage through the state courts, in and of itself, is insufficient. *See Picard*, 404 U.S. at 275. To provide the State with the necessary "opportunity," the prisoner must fairly present his claim in each appropriate state court (including a state supreme court with powers of discretionary review), alerting that court to the federal nature of the claim and "giv[ing] the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); *see also Duncan*, 513 U.S.

at 365-66. "A petitioner has fairly presented his claim only if he has informed the state court of both the factual and the legal premises of the claim he asserts in federal court." *Jones v. Keane*, 329 F.3d 290, 294-95 (2d Cir. 2003) (quoting *Dorsey v. Kelly*, 112 F.3d 50, 52 (2d Cir. 1997)) (internal quotation marks omitted). "Specifically, [petitioner] must have set forth in state court all of the essential factual allegations asserted in his federal petition; if material factual allegations were omitted, the state court has not had a fair opportunity to rule on the claim." *Daye*, 696 F.2d at 191; *see also United States ex rel. Rogers v. LaVallee*, 463 F.2d 185, 187 (2d Cir. 1972). To that end, "[t]he chief purposes of the exhaustion doctrine would be frustrated if the federal habeas court were to rule on a claim whose fundamental legal basis was substantially different from that asserted in state court." *Daye*, 696 F.2d at 192.

### 2. State Procedural Requirements

Similar to a failure to exhaust a claim, a habeas petitioner's failure to satisfy a state's procedural requirements deprives the state courts of an opportunity to address the federal constitutional or statutory issues in a petitioner's claim. *Coleman v. Thompson*, 501 U.S. 722, 731-32 (1991). "[A] claim is procedurally defaulted for the purposes of federal habeas review where 'the petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.'" *Reyes v. Keane*, 118 F.3d 136, 140 (2d Cir. 1997) (quoting *Coleman*, 501 U.S. at 735) (emphasis omitted).

Even where a plaintiff properly exhausts his claim, however, exhaustion "does not automatically entitle the habeas petitioner to litigate his or her claims in federal court.

Instead, if the petitioner procedurally defaulted those claims, the prisoner generally is barred from asserting those claims in a federal habeas proceeding." *Woodford v. Ngo*, 548 U.S. 81, 93 (2006) (citing *Gray v. Netherland*, 518 U.S. 152, 162 (1996); *Coleman*, 501 U.S. at 744-51)). "[T]he procedural bar that gives rise to exhaustion provides an independent and adequate state-law ground for the conviction and sentence, and thus prevents federal habeas corpus review of the defaulted claim, unless the petitioner can demonstrate cause and prejudice for the default." *Gray*, 518 U.S. at 162.

The procedural bar rule in the review of applications for writs of habeas corpus is based on the comity and respect accorded to state judgments. *See House v. Bell*, 547 U.S. 518, 536 (2006). The purpose of this rule is to maintain the delicate balance of federalism by retaining a state's right to enforce its laws while maintaining its judicial procedures as it sees fit. *Coleman*, 501 U.S. at 730-31.

Once it is determined that a claim is procedurally barred under state rules, a federal court may still review such a claim on its merits if the petitioner can demonstrate both cause for the default and prejudice resulting therefrom, or if he can demonstrate that the failure to consider the claim will result in a miscarriage of justice. *Id.* at 750. A miscarriage of justice occurs in extraordinary cases, such as a constitutional violation resulting in the conviction of an innocent individual. *Murray v. Carrier*, 477 U.S. 478, 496 (1986).

### 3. Application

Petitioner raised his claim that African Americans were systematically excluded from the grand and petit juries for the first time when he filed the instant petition.

Therefore, the claim was not fairly presented to "[t]he state courts in order to give the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Duncan*, 513 U.S. at 365 (quoting *Picard*, 404 U.S. at 275). Accordingly, the claim is not properly exhausted and cannot be considered by this Court. Petitioner's only explanation for his failure to raise this claim in his appeal to the Appellate Division is that his attorney advised him to focus on stronger claims. (Pet'r Br., E.D.N.Y., dated July 21, 2011.) However, under the *Strickland* standard for ineffective assistance of counsel, petitioner must do more than show his appellate counsel "omitted a non-frivolous argument." *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994) (citing *Jones v. Barnes*, 463 U.S. 745, 754 (1983)). Counsel was objectively reasonable in focusing on petitioner's stronger claims, and petitioner has not demonstrated any prejudice from this decision or that a fundamental miscarriage of justice would occur if these claims were not reviewed by the Court. Moreover, although petitioner filed a motion claiming he is actually innocent (*see* Docket No. 32), the filing does not contain any new evidence that would have caused a reasonable jury to find petitioner not guilty. In fact, the overwhelming evidence presented at trial clearly established Clark's guilt beyond a reasonable doubt. Accordingly, the claim is procedurally barred from habeas review.[3]

---

[3] Even assuming *arguendo* that the claim is reviewable, petitioner has not carried his burden of presenting any evidence to this Court that African Americans were systematically excluded from the juries. Accordingly, petitioner's challenge also fails on the merits. *See McKinney v. Artuz*, 326 F.3d 87, 97 (2d Cir. 2003) (explaining that moving party must first make prima facie case that the nonmoving party's peremptory was based on race).

## B. Other Grounds for Relief

For the reasons set forth below, the Court finds that petitioner's other grounds for habeas relief fail on the merits.

### 1. Probable Cause for Arrest

Petitioner claims his conviction was "obtained by use of evidence obtained pursuant to an unlawful arrest." (Pet'r Br., E.D.N.Y., dated July 21, 2011.) It is unclear whether petitioner is referring to being handcuffed and later searched and seized at the Texaco station by Officer Popielaski, or to his subsequent formal arrest for burglary. Liberally construing the petition to assume he is bringing both claims, neither claim is a grounds for habeas relief.

First, petitioner's claim that the seizure of pawn tickets by Officer Popielaski was illegal is moot because the Appellate Division suppressed the pawn tickets and "fruits thereof" because the tickets were improperly seized. (Op. 12/4/07.) As a result, count two of petitioner's burglary conviction was vacated. (*See* Resp't Br., County Court, Suffolk County, dated December 4, 2008.)

Second, construing petitioner's claim as a challenge to his subsequent formal arrest for lack of probable cause, it is well-settled that, "[w]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Stone v. Powell*, 428 U.S. 465, 494 (1976). The Second Circuit has further explained that, under *Powell*, "review of fourth amendment claims in habeas petitions would be undertaken in only one of two instances: (a) if the state has provided no corrective procedures at all to redress the alleged fourth amendment

violations; or (b) if the state has provided a corrective mechanism, but the defendant was precluded from using that mechanism because of an unconscionable breakdown in the underlying process." *Capellan v. Riley*, 975 F.2d 67, 70 (2d Cir. 1992). Courts have described such a breakdown as occurring when the state court "failed to conduct a reasoned method of inquiry into relevant questions of fact and law." *Id.* at 71 (citation and internal quotation marks omitted).

Here, it is clear that New York has adequate corrective procedures for litigating Fourth Amendment claims, which are set forth in N.Y. C.P.L. §§ 710.10 *et seq. See, e.g.*, *Capellan*, 975 F.2d at 70 n.1 ("[T]he 'federal courts have approved New York's procedure for litigating Fourth Amendment claims . . . as being facially adequate.'" (quoting *Holmes v. Scully*, 706 F. Supp. 195, 201 (E.D.N.Y. 1989)); *McPhail v. Warden, Attica Corr. Facility*, 707 F.2d 67, 69 (2d Cir. 1983) (New York's procedure for litigating a Fourth Amendment claim in a criminal trial complied with requirement that state provide an opportunity to litigate such claims); *see also Blagrove v. Mantello*, 104 F.3d 350, 350 (2d Cir. 1996) (where defendant's "Fourth Amendment issues were raised before the trial court in the suppression hearing and before the Appellate Division in [his] pro se brief," defendant's "Fourth Amendment argument is barred [from federal habeas review] because the issue was fully and fairly litigated in the state courts.").

It also is clear that petitioner took advantage of such procedures. As set forth *supra*, he raised his Fourth Amendment claim both in the lower court and on appeal to the Appellate Division. The Appellate Division remanded the case to the Supreme Court for a *Dunaway* hearing to determine whether the pawn tickets were improperly seized by Officer Popielaski. (Op. 5/23/06.)

Even after the lower court found against petitioner, the Appellate Division modified the ruling by deeming the pawn tickets inadmissible. (Op. 12/04/07.) Thus, the record reveals no "'disruption or obstruction of a state proceeding' typifying an unconscionable breakdown." *Capellan*, 975 F.2d at 70 (quoting *Shaw v. Scully*, 654 F. Supp. 859, 864 (S.D.N.Y. 1987)). In short, having fully availed himself of New York's corrective procedures as to his Fourth Amendment claims, petitioner has had an opportunity for full and fair litigation of the claim; he therefore may not raise it on federal habeas review.

In any event, even if this Court could review this claim, the claim is without merit. Officer Popielaski testified, *inter alia*, that (1) he observed petitioner standing in a location where "usually you don't see people just standing there" (Tr. 883); (2) a few minutes later, Officer Popielaski learned that a house near that location had been burglarized, and he then saw petitioner running from the area of the burglary (Tr. 887); and (3) Officer Popielaski approached petitioner, who appeared "fatigued," and his suspicions were further heightened because petitioner also appeared "fidgety" (Tr. 893, 899). Although the Second Department concluded that probable cause did not exist at the time to arrest petitioner (and thus it suppressed the pawn receipts seized at that time), Officer Popielaski subsequently received another piece of information (apart from the pawn receipts) that provided a more than sufficient basis for the arrest—namely, that Clark was on parole for burglary. (*See* Suppression Hr'g 96 (stating that at the time he placed Clark into handcuffs, immediately after taking the pawn slips, he did not know that Clark was on parole); Hr'g 14 (Officer Popielaski informed Officer Weisse that petitioner was on parole).) That additional information (which was obtained after, and independent from, the seizure of the pawn receipts), combined with the earlier information, provided probable cause for petitioner's arrest in connection the Harned Road burglary. *See, e.g.*, *United States v. Wagner*, 989 F.2d 69, 73 (2d Cir. 1993) ("Prior convictions are a relevant consideration in determining probable cause."); *see also Sibron v. New York*, 392 U.S. 40, 66-67 (1968) ("flight at the approach of strangers or law officers . . . when coupled with specific knowledge . . . relating the suspect to the evidence of crime" provides probable cause for arrest); *Jones v. United States*, 362 U.S. 257, 271 (1960), *overruled on other grounds by United States v. Salvucci*, 448 U.S. 83 (1980) ("[T]hat petitioner was a known user of narcotics made the charge against him less subject to scepticism [sic] than would be such a charge against one without such a history."); *Briscoe v. Ercole*, 565 F.3d 80, 95 (2d Cir. 2009) (noting prior convictions for robbery and burglary relevant on issue of reliability of eyewitness testimony in attempted burglary case). Thus, there was no basis to suppress any additional evidence or statements based upon the Second Department's conclusion that probable cause did not yet exist at the time of the seizure of the pawn tickets.

Accordingly, the Court denies the petition for a writ of habeas corpus on these grounds.

2. Admissibility of Written Confession

Petitioner argues that his Fifth Amendment right of self-incrimination was violated when the trial court allowed the admission of the written confession, which included statements made to Detective Weiss before petitioner was Mirandized. As set forth below, the Court finds no merit in this claim on federal or state law grounds. Further, even assuming *arguendo* that petitioner's constitutional rights were

violated, under the *Brecht* standard of review, the claim warrants no relief.[4]

### a. Legal Standard

The Fifth Amendment provides that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The Supreme Court has declared that the privilege against self-incrimination is "an important advance in the development of our liberty—'one of the great landmarks in man's struggle to make himself civilized.'" *Ullman v. United States*, 350 U.S. 422, 426 (1956). Indeed, the Fifth Amendment "reflects many of our fundamental values and most noble aspirations." *Murphy v. Waterfront Comm. of N.Y. Harbor*, 378 U.S. 52, 55 (1964), *overruled on other grounds by United States v. Balsys*, 524 U.S. 666 (1998). Thus, the rights inherent in the Fifth Amendment "must be accorded liberal construction in favor of the right [the Fifth Amendment] was intended to secure." *Hoffman v. United States*, 341 U.S. 479, 486 (1951). To that end, the Supreme Court established "*Miranda* warnings" as procedural safeguards to be offered a person in police custody, for the purpose of establishing a presumption that any subsequent statements were voluntary and free. *See generally Miranda v. Arizona*, 384 U.S. 436 (1966). The *Miranda* safeguards are "not themselves rights protected by the Constitution but [are] instead measures to insure that the right against compulsory self-incrimination [is] protected." *Michigan v. Tucker*, 417 U.S. 433, 444 (1974). *Miranda* warnings do not function to bar all confessions made by un-Mirandized defendants. For *Miranda* to be triggered, a defendant must be subjected to custodial interrogation. Outside of that setting,

"[v]olunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected." *Miranda*, 384 U.S. at 478.

When an initial confession is improperly obtained without the requisite *Miranda* warnings, a subsequent confession obtained after proper warnings is not necessarily precluded from admission. *See Oregon v. Elstad*, 470 U.S. 298, 318 (1985). Notably, federal and New York constitutional law diverge in their criteria for proper admission of such post-warning statements. The United States Supreme Court has held that "[i]t is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period." *Id.* at 309. According to *Elstad*, "a careful and thorough administration of *Miranda* warnings serves to cure the condition that rendered the unwarned statement inadmissible. The warning conveys the relevant information and thereafter the suspect's choice whether to exercise his privilege to remain silent should ordinarily be viewed as an 'act of free will.'" *Id.* at 310-11. Thus, the admissibility of post-Mirandized statements "turns . . . solely on whether [they are] knowingly and voluntarily made," *id.* at 309, and if such is the case, a pronounced break in questioning is not required by the Fifth Amendment.

In contrast, under state law, the New York Court of Appeals held in *Chapple* that a "definite, pronounced break in the interrogation that the defendant may be said to have returned, in effect, to the status of one who is not under the influence of questioning" is necessary for admission of

---

[4] Respondent incorrectly characterizes this as a Fourth Amendment issue.

subsequent Mirandized statements even if made knowingly and voluntarily. *People v. Chapple*, 38 N.Y.2d 112, 115 (1975). In this respect, New York's *Chapple* rule affords protections beyond those required by federal constitutional law as explicated in *Elstad*. In *People v. Bethea*, 67 N.Y.2d 364 (N.Y. 1986) (per curiam), the Court of Appeals explicitly confirmed that Article I, Section 5 of the New York Constitution exceeded the demands of *Elstad*, and that *Chapple* properly articulated a state constitutional right against self-incrimination. In *Tankleff*, the Second Circuit also recognized this variance between federal and state law. *Tankleff v. Senkowski*, 135 F.3d 235, 246 (2d Cir. 1998).[5]

### b. Application

There is no dispute that petitioner was "in custody" for both his pre- and post-*Miranda* statements. At trial, both Officer Popielaski and Detective Weisse testified that petitioner was not free to leave the Texaco gas station. (Tr. 685, 931.) Yet, even

assuming the statements petitioner made at Texaco were inadmissible, there is no *Miranda* issue concerning the written confession subsequently given at the police station. Petitioner was properly Mirandized and waived his rights before giving the full confession to Detective Weisse. (Tr. 584, 600.)

The Second Circuit has upheld the admission of a written confession in analogous circumstances. In *Nova v. Bartlett*, 211 F.3d 705, 708 (2d Cir. 2000), the petitioner, before being Mirandized, told police, "All right, I'll tell you the truth. I ain't going to fool around with you. I'll tell you the honest truth." He was then Mirandized and gave a written confession. *Id.* at 708. The Second Circuit held the written confession admissible, stating:

> [T]here is no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of *Miranda,* was voluntary. The relevant inquiry is whether, in fact, the second statement was also voluntarily made. . . . No further purpose is served by imputing 'taint' to subsequent statements obtained pursuant to a voluntary and knowing waiver. We hold today that a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings.

*Nova*, 211 F.3d at 708-09 (citing *Elstad*, 470 U.S. at 311-14).

The evidence also indicates that petitioner made the post-*Miranda* statements voluntarily. While the "ultimate issue of voluntariness [of a confession] is a legal question requiring independent federal

---

[5] In *Tankleff v. Senkowski*, 135 F.3d 235 (2d Cir. 1998), the Second Circuit stated:

> We note that the state courts . . . failed to distinguish between [petitioner's pre-Mirandized and post-Mirandized] confessions because the New York Court of Appeals has declined on state constitutional grounds to follow the rule of *Oregon v. Elstad* . . . . It might appear—given the state court holdings rejecting *Elstad* and given our decision that Tankleff was in custody, thereby making his 'first' confession inadmissible under *Miranda*—that we should also deem his second confession to be excludable. But *we* can only grant habeas relief based on violations of *federal* right. Thus, it is not for us to say whether Tankleff might or might not have any claim based on state constitutional law as a result of our holding that Tankleff was, under *Miranda* and its federal progeny, in custody at the time of his "first" confession.

*Id.* at 246 (citations omitted) (emphasis in original).

determination," *Nelson v. Walker*, 121 F.3d 828, 833 (2d Cir. 1997) (citing *Arizona v. Fulminante*, 499 U.S. 279, 287 (1991)), the factual questions underlying a legal determination are entitled to a statutory presumption of correctness, *id.*; *see also* 28 U.S.C. § 2254(e) (1) ("[A] determination of a factual issue made by a State court shall be presumed to be correct"). Such underlying facts involve those that are "historical facts, that is, recitals of external events and the credibility of the witnesses narrating them." *Nelson*, 121 F.3d at 833 (citation and internal quotation omitted). For a habeas petitioner to overcome this statutory presumption, the petitioner carries the burden of rebuttal with "clear and convincing evidence." 28 U.S.C. § 2254(e) (1). Moreover, habeas relief may only be granted if the resulting decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d) (2).

Here, petitioner does not claim that his statements at the Texaco station were involuntary. Nothing in the record shows that his later, written confession was involuntary either. Petitioner was questioned in an interview room; there is no evidence that petitioner was deprived of the ability to eat, drink, or use the bathroom; Detective Weisse read petitioner each of his *Miranda* rights prior to questioning; and petitioner waived each right by initialing next to it prior to making his confession. (Tr. 596-98.) Thus, the statements made at the Texaco did not undermine the voluntariness and admissibility of the post-*Miranda* confession. *See Nova*, 211 F.3d at 708-09. Therefore, the Appellate Division's conclusion that the written statement is admissible was not "contrary to, or an unreasonable application of, clearly established federal law" nor was it "based on an unreasonable determination of the

facts in light of the evidence presented." Thus, under *Elstad*, the admission of the post-Mirandized statements did not violate the petitioner's Fifth Amendment rights.[6]

### c. Harmless Error

Even assuming *arguendo* that petitioner's constitutional rights had been violated, under the *Brecht* standard of review, petitioner's claim warrants no relief.

The *Brecht* standard of harmless error review applies regardless of whether petitioner's rights were violated due to *Miranda* violations. The United States Supreme Court has held "that in § 2254

---

[6] Although the Court need not examine this claim under state law for purposes of habeas, petitioner's claim also fails under New York law because the confession given at the Fourth Precinct was made several hours after the statements at the Texaco station. As the Court of Appeals has explained,

> [w]arnings, to be effective under the combined holdings in *Miranda* and *Westover*, must precede the subjection of a defendant to questioning. Later is too late, unless there is such a definite, pronounced break in the interrogation that the defendant may be said to have returned, in effect, to the status of one who is not under the influence of questioning.

*Chapple*, 38 N.Y.2d at 115. Thus, in *People v. Santarelli*, 704 N.Y.S.2d 90, 91 (N.Y. App. Div. 2000), where the petitioner had made statements to police at the scene of his arrest before he was Mirandized and moved to suppress statements that he later made at the police station after being advised of his *Miranda* rights, the Appellate Division held that the later, post-*Miranda* statements were admissible because *Miranda* rights had been waived, and "defendant was not subject to such continuous interrogation that the *Miranda* warnings given to him were insufficient to protect his rights." Similarly, here, petitioner waived his *Miranda* rights prior to producing a written statement. (Tr. 584, 600.) Because several hours had passed between the statements made at the Texaco station and the statements made at the Fourth Precinct, (*see* Tr. 599), there was no "continuous interrogation" nullifying the *Miranda* waiver.

proceedings a court must assess the prejudicial impact of constitutional error in a state court criminal trial under the . . . standard set forth in *Brecht* . . . , whether or not the state appellate court recognized the error and reviewed it for harmlessness [under the *Chapman* standard]." *Fry v. Pliler*, 127 S. Ct. 2321, 2328 (2007). Under *Chapman*, the state is required to "prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman v. California*, 386 U.S. 18, 24 (1967). The more stringent *Brecht* standard, applicable to collateral review of state court error, asks "whether the error 'had a substantial and injurious effect or influence in determining the jury's verdict[,]'" *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)), and shifts the burden of proof from the state to the petitioner. *Bentley v. Scully*, 41 F.3d 818, 824 (2d Cir. 1994). Petitioners "are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Brecht*, 507 U.S. at 637 (citing *United States v. Lane*, 474 U.S. 438, 449 (1986)). Thus, "[h]abeas relief is not appropriate when there is merely a 'reasonable possibility' that trial error contributed to the verdict." *Bentley v. Scully*, 41 F.3d 818, 824 (2d Cir. 1994) (citing *Brecht*, 507 U.S. at 637).

Here, the overwhelming evidence of petitioner's guilt renders any improper admission of petitioner's statements harmless error under *Brecht*. For instance, in addition to the written confession (Tr. 601-606), petitioner was seen running from the area shortly after police arrived on the scene in Commack (Tr. 887); a fingerprint found on a Stern's paper box top outside the Harned Road residence was a match to petitioner's (Tr. 1071, 1078); and Melden-Sharpe's testimony that the Marc Ecko shoe could have made the footwear impression at

the scene (Tr. 1195-1206). As a result, the Court does not consider petitioner's inculpatory statements, even if improperly admitted, to have had a substantial and injurious effect or influence in the jury verdict. *See, e.g.*, *Nova*, 211 F.3d at 709.

In sum, the Court denies petitioner's self-incrimination claim because there was no violation of federal or state constitutional law. Furthermore, even if a violation had occurred, any such violation would constitute harmless error under the applicable *Brecht* standard.

### 3. Illegal Search and Seizure

As analyzed *supra*, petitioner's claim that pawn tickets were illegally seized from him by Officer Popielaski is moot because the Appellate Division ruled on this issue, and petitioner prevailed. (Op. 12/4/07.)

### 4. Sixth Amendment Violation

Petitioner contends that he "never saw, spoke to or appeared in court with a lawyer prior to being indicted," so he was "unable to discuss the charges against him, which way to plea, R.O.R. status, to be heard on bail, or explore alibi defense or right to testify at grand jury." (Pet'r Br., E.D.N.Y., dated July 21, 2011.) Petitioner's claim is meritless because petitioner was appointed counsel at his arraignment.

A defendant's Sixth Amendment right to counsel attaches at arraignment. *See, e.g.*, *United States v. Edwards*, 342 F.3d 168, 182 (2d Cir. 2003) ("The Sixth Amendment right to counsel attaches at the initiation of adversary judicial proceedings, such as arraignment or filing of an indictment." (internal quotation marks omitted)); *see also United States v. Moore*, 670 F.3d 222, 234 (2d Cir.) (noting that "arrest on a warrant, even one issued pursuant to a criminal complaint sworn out by prosecutors," does

not trigger Sixth Amendment right to counsel), *cert. denied* 133 S. Ct. 48 (2012); *People v. Settles*, 46 N.Y.2d 154, 164 (1978) (explaining that although the right to counsel may "attach" at the indictment stage, attorneys for indigent criminal defendants are typically not appointed until arraignment). Adversary judicial proceedings can include a "formal charge, preliminary hearing, indictment, information, or arraignment." *See Kirby v. Illinois*, 406 U.S. 682, 689 (1972).

Thus, to the extent petitioner argues he was denied counsel prior to his indictment, this claim is meritless. Petitioner's right to counsel does not attach until adversary judicial proceedings have been initiated against him. *See Kirby*, 406 U.S. at 688. Here, adversary judicial proceedings began against petitioner at the time of his grand jury indictment. (*See* Indictment 1-2.)

The Court also has liberally construed petitioner's claim—that he "couldn't afford an attorney and was unable to discuss the charges against him, which way to plea, R.O.R. status, to be heard on bail or explore alibi defense, or right to testify at grand jury"—to mean that petitioner was denied the right to counsel between the time of his indictment and arraignment. This claim is unpreserved and unexhausted, having never been argued before any court. The record is also devoid of any evidence that petitioner requested counsel prior to his arraignment and was denied. In any event, the claim that he lacked counsel between indictment and arraignment is meritless. Petitioner does not claim that any police action was taken between the time of his indictment and arraignment which would violate his Sixth Amendment right to counsel. At arraignment, petitioner was appointed counsel, Macedonio. (Arraignment 2.) In sum, this claim has no merit.

5.      Ineffective Assistance of Counsel

Petitioner argues that both his pre-trial counsel and appellate counsel provided ineffective assistance. As set forth herein, the record as a whole demonstrates that petitioner received effective representation, and the lower courts' decisions on that issue were neither contrary to, nor based on an unreasonable application of, clearly established federal law. Therefore, this Court denies habeas relief on this ground.

a.   Legal Standard

Under the standard promulgated in *Strickland v. Washington*, 466 U.S. 668 (1984), a petitioner is required to demonstrate two elements in order to state a successful claim for ineffective assistance of counsel: (1) "counsel's representation fell below an objective standard of reasonableness," *id.* at 688, and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694.

The first prong requires a showing that counsel's performance was deficient. However, "[c]onstitutionally effective counsel embraces a 'wide range of professionally competent assistance,' and 'counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Greiner v. Wells*, 417 F.3d 305, 319 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 690). The performance inquiry examines the reasonableness of trial counsel's actions under all circumstances, keeping in mind that a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight." *Id.* at 319 (quoting *Rompilla v. Beard*, 545 U.S. 374, 408 (2005)) (internal quotation marks omitted). In assessing

performance, a court must apply a "'heavy measure of deference to counsel's judgments.'" *Id.* at 319 (quoting *Strickland*, 466 U.S. at 691). "A lawyer's decision not to pursue a defense does not constitute deficient performance if, as is typically the case, the lawyer has a reasonable justification for the decision," *DeLuca v. Lord*, 77 F.3d 578, 588 n.3 (2d Cir. 1996), and "'strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable,'" *id.* (quoting *Strickland*, 466 U.S. at 690). Moreover, "'strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'" *Id.* at 588 (quoting *Strickland*, 466 U.S. at 690-91).

The second prong focuses on prejudice to a petitioner. A petitioner is required to show that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "Reasonable probability" means that the errors were of a magnitude such that it "undermine[s] confidence in the outcome." *Pavel v. Hollins*, 261 F.3d 210, 216 (2d Cir. 2001) (quoting *Strickland*, 466 U.S. at 694). "[T]he question to be asked in assessing the prejudice from counsel's errors . . . is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Henry v. Poole*, 409 F.3d 48, 63-64 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 695). "'An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.'" *Lindstadt v. Keane*, 239 F.3d 191, 204 (2d Cir. 2001) (quoting *Strickland*, 466 U.S. at 691). Moreover, "[u]nlike the determination of

trial counsel's performance under the first prong of *Strickland*, the determination of prejudice 'may be made with the benefit of hindsight.'" *Hemstreet v. Greiner*, 491 F.3d 84, 91 (2d Cir. 2007) (quoting *Mayo v. Henderson*, 13 F.3d 528, 534 (2d Cir. 1994)).

This Court proceeds to examine petitioner's claim, keeping in mind that petitioner bears the burden of establishing both deficient performance and prejudice. *United States v. Birkin*, 366 F.3d 95, 100 (2d Cir. 2004).

b. Application

i. Pre-trial Counsel

Petitioner argues that pre-trial counsel's assistance was ineffective because: (1) petitioner was "unable to discuss the charges against him, which way to plea, R.O.R. status, to be heard on bail or explore alibi defense, or right to testify at grand jury"; and (2) "[the] attorney present at the [arraignment] was so unfamiliar with the case that there was no challenge to the indictment, no sworn allegations of facts, and no legal authority to support any pre-trial motions, and there was no communication to investigate defense." (Pet'r Br., E.D.N.Y., dated July 21, 2011.)

(1) Which Way to Plead

Petitioner's claim that he was not advised on which way to plead is not supported by the record. The record shows that there was a discussion about a twelve year plea deal on June 14, 2002, before Judge Mullen, following the *Huntley* and *Mapp* hearing. (Hr'g 110-11.) At the hearing, petitioner's pre-trial counsel Mr. Macedonio, stated on the record that he had explained to petitioner the consequences of accepting a plea versus going to trial. (Hr'g 110.) Mr. Macedonio also stated, "[M]y

advice to him, after reviewing the case and sitting for the hearings, would be to take that plea" and "I indicated to him it would be in his interest, according to my review of the case, to take the [plea]." (Hr'g 110.) Petitioner addressed the court at that time and said that he could not take a plea because he felt his constitutional rights had been violated. (Hr'g 111). Petitioner subsequently went to trial. Mr. Macedonio clearly advised petitioner that a plea deal would be beneficial. (Hr'g 110.) There simply is no evidence that his actions fell below an objective standard of reasonableness. Petitioner had the right to make his own decision regarding the offered plea deal and cannot argue ineffective assistance of counsel because, in hindsight, he may believe he made the wrong decision.

### (2) Opportunity to Discuss Bail and Defenses

Petitioner's claim that his counsel was ineffective for not affording him an opportunity to discuss bail or R.O.R. status before trial also is meritless. Petitioner was granted a bail of $250,000 at arraignment. Mr. Macedonio asked for bail to be set at $20,000 and the court responded, "No. $250,000. Cash only." (Arraignment 5.) Thus, nothing indicates that any discussion of bail would have had any effect on the proceedings. Similarly, petitioner's claim that he did not get to explore alibi defenses is meritless because (1) there would generally be no reason to discuss alibi defense at arraignment; and (2) petitioner had already provided a sworn written statement to police admitting that he was at the scene of the burglary. Petitioner also fails to demonstrate any prejudice from the absence of this discussion.

### (3) Testifying Before Grand Jury

Petitioner claims that he received ineffective assistance of counsel because he was unable to testify at the grand jury proceedings. (Pet'r Br., E.D.N.Y., dated July 21, 2011). There is no federally-cognizable ineffective assistance claim concerning advice regarding the state grand jury process. As the Second Circuit has explained:

> We also reject the petitioner's argument that his claim should be interpreted as a claim for ineffective assistance of counsel based on his attorney's failure to secure his right to testify before the grand jury. . . . A defendant's right to testify before the grand jury is not a constitutional right; rather, it is a statutorily created right. N.Y. Crim. Proc. Law § 190.50(5). New York courts have consistently held that *counsel's failure to ensure that the defendant testifies before the grand jury does not amount to ineffective assistance of counsel*.

*Davis v. Mantello*, 42 F. App'x 488, 491 n.1 (2d Cir. 2002) (emphasis added; citing cases); *accord Montalvo v. Annetts*, 02 Civ. 1056, 2003 WL 22962504 at *24 (S.D.N.Y. Dec. 17, 2003) (citing cases); *see also Turner v. Fischer*, Nos. 01-CV-3251, 03-MISC-0066, 2003 WL 22284177 at *6 (E.D.N.Y. Aug. 20, 2003) (Even "[a]ssuming . . . counsel waived [petitioner's] right to appear before the grand jury without petitioner's permission, petitioner cannot demonstrate that he was prejudiced thereby. He was afforded a jury trial and was convicted by a petit jury after testifying before it. Any prejudice suffered by petitioner was rendered harmless by his conviction at trial by the petit jury, which assessed his guilt under a heightened standard of proof."); *Wilson v. Breslin*, 217 F.R.D. 119, 126 (E.D.N.Y. 2003) (Even if petitioner was denied his right to testify before the grand jury, trial counsel was "not

ineffective for failing to raise this claim before the trial court" since "[h]abeas relief is not warranted on this ground. The evidence of guilt at trial made irrelevant whatever grand jury error existed.").

Even if the claim were cognizable, it is meritless. Under N.Y. C.P.L. § 190.50(5), the petitioner's right to testify at grand jury proceedings is not absolute:

Although not called as a witness by the people or at the instance of the grand jury, a person has a right to be a witness in a grand jury proceeding under circumstances prescribed in this subdivision: (a) When a criminal charge against a person is being or is about to be or has been submitted to a grand jury, such person has a right to appear before such grand jury as a witness in his own behalf if, prior to the filing of any indictment or any direction to file a prosecutor's information in the matter, he serves upon the district attorney of the county a written notice making such request and stating an address to which communications may be sent. The district attorney is not obliged to inform such a person that such a grand jury proceeding against him is pending, in progress or about to occur unless such person is a defendant who has been arraigned in a local criminal court upon a currently undisposed of felony complaint charging an offense which is a subject of the prospective or pending grand jury proceeding.

Nothing in the record indicates that petitioner requested to testify at the grand jury proceeding, as is required to enforce this right, and therefore his attorney did not act objectively unreasonably by not having him testify. Additionally, petitioner's claim

fails the second prong of the *Strickland* standard. There is no reasonable probability, had petitioner been able to testify, that the outcome of the proceedings would have been different.

(4) Failure to Challenge Indictment or Make Sworn Allegations of Fact

Petitioner's claim that he received ineffective assistance of counsel at the arraignment because counsel failed to challenge the indictment or make any sworn allegations of facts to support pre-trial motions, was "rendered academic" on May 23, 2006, when the Appellate Division ordered a *de novo* suppression hearing. (Op. 5/23/06.) Therefore, even if counsel's failure to make a pre-trial motion for a *Dunaway* hearing failed the first prong of the *Strickland* test, no prejudice existed because petitioner was granted a hearing (Op. 5/23/06), and ultimately prevailed (Op. 12/4/07). Petitioner provides no information about what other "challenges to the indictment" should have been raised.

ii. Appellate Counsel

Petitioner argues that his appellate counsel's assistance was ineffective because: (1) counsel failed to raise the point that petitioner was denied the right to counsel at critical stages, grand jury proceedings and throughout the pre-trial stages of proceedings; (2) counsel failed to raise the spillover effect as a claim; and (3) counsel failed to argue that petitioner's 1995 sentence was illegal and therefore tainted the 2002 sentence.

Petitioner's claims are meritless because they are not supported by the record. Appellate counsel raised petitioner's Sixth Amendment claim and spillover claim on appeal. (*See* App. Br., 28, Pet'r Br. Following Hr'g 11.) Additionally, petitioner's claim of an illegal sentence is

frivolous, and, therefore, counsel was not ineffective under the *Strickland* standard for failing to raise it. In attempting to meet the first prong of *Strickland*, petitioner must do more than show that his appellate counsel "omitted a nonfrivolous argument." *Mayo*, 13 F.3d at 533 (citing *Jones*, 463 U.S. at 754). Instead, petitioner must demonstrate that his appellate counsel "omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." *Id.*

### (1)    Failure to Raise Sixth Amendment Violation Claim

On appeal, appellate counsel raised the claim that petitioner was denied the right to counsel as a part of the ineffective assistance of pre-trial counsel claim: "During the four days of proceedings that preceded the filing of the indictment, Defendant-Appellant was clearly denied his Constitutional right to the assistance of counsel, because he never saw or spoke to a lawyer. During that period therefore, he was literally not represented by counsel." (App. Br., 28.) Therefore, petitioner's claim that his appellate counsel provided ineffective assistance for failure to make this argument is meritless.

### (2) Failure to Raise Spillover Effect

Petitioner's argument that appellate attorney did not raise the "spillover effect" of the seizure of the pawn tickets on his other conviction is unsupported by the record. After the suppression hearing, the appellate attorney filed an additional brief and not only argued that the search and seizure of petitioner was unauthorized, but also that "the pawn tickets themselves formed part of the basis for the defendant's formal arrest. All evidence flowing from the illegal detention must therefore be suppressed and the convictions on both counts in the indictment must be reversed." (Pet'r Br. Following Hr'g 11.) Additionally,

when the Appellate Division modified the Supreme Court of Suffolk County's ruling, they addressed the spillover effect, stating:

> [T]he proof of the defendant's guilt of the Harned Road burglary, without reference to the improperly-admitted evidence, was overwhelming, and there is no reasonable possibility that the admission at trial of the pawn tickets and jewelry from the other burglary might have contributed to the defendant's conviction on count one.

(Op. 12/4/07.)

Therefore, appellate counsel's actions were objectively reasonable and cannot support petitioner's claim for habeas relief.[7]

### (3) Failure to Raise Illegal Sentence Claim

Petitioner argues that appellate counsel was ineffective because she did not argue that petitioner's 1995 sentence was illegal and that this rendered the 2002 sentence illegal as well. Petitioner's claim that counsel was ineffective for failing to raise an issue with respect to the 1995 sentence is meritless. The sentence was imposed long before the instant case, and no tangible relief could be provided, as discussed further *infra*. Accordingly, counsel was not objectively unreasonable for not raising the claim on appeal.

---

[7] The Court also concludes that the strength of the prosecution's case on the remaining count was overwhelming, and nothing indicates that "'there is a reasonable possibility that the jury's decision to convict on the tainted count[] influenced its guilty verdict on the remaining count[] in a meaningful way.'" *Jelinek v. Costello*, 247 F. Supp. 2d 212, 277 (E.D.N.Y. 2003) (quoting *People v. Doshi*, 93 N.Y.2d 499, 505 (1999)).

### 6. Illegal Sentence From 1995

Petitioner claims he was erroneously sentenced in 1995 as a second felony offender under a guilty plea, when he was actually a second violent felony offender, making that sentence illegal. (Pet'r Br., E.D.N.Y., dated July 21, 2011.) Therefore, he contends his 1995 sentence was illegally used as a predicate to adjudicate petitioner as a persistent violent felony offender under his current conviction, making his 2002 sentence illegal. (Pet'r Br., E.D.N.Y., dated July 21, 2011.)

As a threshold matter, petitioner's claim is not a cognizable issue for habeas review because there is no cognizable federal constitutional issue to a claim against a term of a sentence as long as the sentence falls within the prescribed statutory range. *See White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992). Burglary in the second degree is a class C felony. N.Y. Penal Law § 140.25. The sentence of a persistent violent felony offender for a class C felony must be a minimum between eight years and twenty-five years and a maximum of life imprisonment. *Id.* § 70.08. Petitioner was sentenced twenty years to life, (sentencing 27), which is within the statutory range.

Even assuming *arguendo* that the claim could be reviewed, it is meritless because petitioner is no longer "in custody" for his 1995 conviction and, therefore, this Court lacks subject matter to review the conviction under 28 U.S.C. § 2254(a). *See Lackawanna Cnty. Dist. Attorney v. Coss*, 532 U.S. 394, 403-04 (2001); *Maleng v. Cook*, 490 U.S. 488, 492-93 (1989). However, "[b]ecause petitioner's [prior conviction was] a necessary predicate to his current confinement, . . . this Court is obliged to construe petitioner's petition as a challenge to his current confinement as 'enhanced' by his previous conviction." *Calhoun v.*

*Richards*, No. C08-974RSL, 2008 WL 5100207, at *2 (W.D. Wash. Nov. 25, 2008) (citing *Maleng*, 490 U.S. at 493-94).

Although petitioner is "in custody" for his current conviction, his claim still fails. The Supreme Court has explained:

> [O]nce a state conviction is no longer open to direct or collateral attack in its own right because the defendant failed to pursue those remedies while they were available (or because the defendant did so unsuccessfully), the conviction may be regarded as conclusively valid. If that conviction is later used to enhance a criminal sentence, the defendant generally may not challenge the enhanced sentence through a petition under [28 U.S.C. § 2254(a)] on the ground that the prior conviction was unconstitutionally obtained.

*Coss*, 532 U.S. at 403-04. Additionally, petitioner was sentenced and served his time for his 1995 conviction over seventeen years ago, and therefore as the County Court properly held, no tangible relief can be provided. (Op. of County Court, Suffolk County, dated March 2, 2010.) In any event, petition has failed to demonstrate how the 1995 conviction was invalid.

In sum, the Court concludes that there is no basis for habeas relief based on the ineffective assistance of pre-trial or appellate counsel.

### IV. CONCLUSION

For the foregoing reasons, petitioner's claims have no merit, and the petition for writ of habeas corpus is denied. Because petitioner has failed to make a substantial showing of a denial of a constitutional right, no certificate of appealability shall issue. *See* 28 U.S.C. § 2253(c)(2). The Clerk of the

Court shall enter judgment accordingly and close the case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge


Dated: April 10, 2014
        Central Islip, New York

*** 

Petitioner is proceeding *pro se*. Respondent is represented by Thomas J. Spota, District Attorney of Suffolk County, by Thomas C. Costello, Assistant District Attorney, District Attorney's Office, 200 Center Drive, Riverhead, NY 11901.